## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KULL AUCTION & REAL ESTATE CO INC., | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Case No. 5:26-cv-04117-TC-BGS |
| WILLIAM MILLER, | ) ) | |
| Respondent. | ) ) ) | |

## EXPERT REPORT OF ANDREW GRAHAM

### June 3, 2024

**I.      Qualifications and Background**

        **a.  Education and Employment History**

        I was appointed as the Deputy Assistant Director, Enforcement Programs and Services (EPS), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), in May 2020 until retirement in December 2022. Prior to this appointment, I served six years as the Deputy Assistant Director, Industry Operations, Field Operations, from August 2014 – May 2020.   My 37-year career with the ATF includes selection as the first Director of Industry Operations (DIO) of the Denver Field Division, the Bureau's 24th field division and, in 2004, I was appointed as the Area Supervisor in Denver, under the Phoenix Field Division, with oversight of regulatory operations in Colorado, Wyoming and Utah.

        In January 2000, I was assigned to ATF's National Academy to oversee new investigator training (Industry Operations Investigator Basic Training). As the senior Program Manager, I had oversight of this training program for four years. I began my career with ATF in 1985, while still enlisted in the United States Air Force (Air National Guardsman), entered public service as an intern with the National Firearms Act Branch in Washington, D.C., and in 1986 joined the ATF professional ranks as an Inspector. I executed the ATF's regulatory mission under both Treasury and the Department of Justice for 14 years in Tennessee, Alabama and Mississippi.  My military service includes the United States Air Force (USAF), the District of Columbia Air National Guard, and Tennessee Air National Guard for nine years while serving as a field inspector in Nashville, Tennessee.

        I attended George Mason University as a Business Administration major and received continuing executive education through the Department of Justice Executive Core Review Board, Harvard Kennedy School of Executive Education.

RESPONDENT'S
Ex. 1

My career encompassed various position within the ATF, ranging from regulatory field Inspector under the Treasury Department (1986-2000) and field Industry Operations Investigator (IOI), Area Supervisor-Phoenix Field Division, DIO-Denver Field Division, Deputy Assistant Director- HQ Field Operations (national oversight), Deputy Assistant Director – Enforcement Programs Services (national oversight) under the Department of Justice (2000-2022). I am a 14-year veteran of conducting compliance inspections, enforcing the Code of Federal Regulations (CFR) under the 1968 Gun Control Act (GCA), and pursuing ATF's Federal Firearms Administrative Action Policy and Procedures over federal firearm licensees' (FFLs) businesses.

In the process of executing compliance inspections and administering the CFR, I assessed FFLs' business operations, accurate completion of required GCA records to identify violations, determined their impact on public safety, compliance with record keeping requirements and impact on crime gun traces. The scope of these inspections was to ensure that FFLs were obtaining and transferring firearms through legal commerce and not diverting them to support criminal activity. My job was to determine operational compliance with the CFR, identify a falsification of records, determine if the FFL's activity was a risk to public or obstructed successful firearm traces.

As a Training/Program Manager assigned to the ATF National Academy from 2000 – 2004 I supervised the Industry Operations program, intake, and training of several hundred new hires. I taught and supervised compliance inspection techniques, ranging from FBI NICS or Point of Sale background checks to falsification of GCA records that resulted in violations and license revocation.

Late in 2004 I was promoted to the first line Area Supervisor position in Denver, Colorado under the Phoenix Field Division. I led a team of 20 Industry Operations Investigators (IOIs) located throughout Colorado, Wyoming and Utah who conducted on-site firearm application and compliance inspections. Working hand in hand with division counsel I helped IOIs refine and develop their findings of hidden ownership or sham applications, which resulted in advancing the case up the chain of command to the DIO for review and consent to proceed with denial. With regards to relating the administrative action policy to FFL revocations and other administrative actions such as warning letters or warning conferences, I worked with division counsel to assist in refinement of inspection results and final recommendations. In applying the ATF's administrative action policy which included warning letters, warning conferences and revocations, I evaluated evidence, such as completed Form 4473 transaction records, bound book entries, background check results, and a plethora of other evidence to confirm willful violations before pushing the case forward to the DIO and SAC for review.

In late 2006, ATF established a 24th field division in Colorado. Field offices and personnel from the St. Paul and Phoenix divisions were realigned to create a division office in Denver. I was appointed to the DIO position and had oversight of all regulatory inspections conducted in Colorado, Wyoming, Montana and Utah. As part of the senior division management team, I was responsible for applying ATF's administrative action policy to compliance inspection of approximately 8700 active FFLs, located between the 4 states. During my tenure as DIO (July 2006 – October 2014) I presided over 250+ administrative actions that included application denials, revocation of FFLs and alternate action cases, wherein FFLs had the opportunity to remediate operations.

2

In October 2014, I was appointed to Deputy Assistant Director over the ATF's regulatory enforcement directorate, Industry Operations located in Headquarters, Washington, DC. I was part of ATF's executive management team and advisor on regulatory operations to the Director. I worked directly with Chief Counsel's office and regional Associate Chief Counsel(s) to monitor, evaluate and apply ATF's administrative action policy to FFLs found in violating the GCA. This involved evaluating monitored cases submitted from all 25 field division offices, under Notices of Revocation and Notices of Denial.

The Administrative Action Policy was evaluated and modified twice during my term as Deputy Assistant Director, to streamline efficiencies of the policy and provide the DIO, Area Supervisor and field IOI latitude and or discretion in managing regulatory matters; *i.e.*, correctable record keeping errors versus licensees operating in blatant disregard of a known legal obligation with proposed alternate actions, such as Area Supervisor or DIO-led warning conferences in lieu of revocation where good cause, absent criminal activity was present.

Throughout my seven-year term as Deputy Assistant Director, I presented and discussed the ATF's inspection policies before the Department of Justice, field division outreach venues, industry engagements at the national level to establish perspective as a regulator, and assisted industry members with understanding their responsibilities prescribed by the GCA.

In May 2020 I was assigned to the Deputy Assistant Director position to head up ATFs Enforcement Programs and Services (EPS) directorate. In this directorate I managed operations and policy associated with ATFs National Tracing Center, Firearms Ammunition Technology Division, Firearms & Explosives Licensing Center, National Firearms Act Division, Office of Regulatory Affairs, Firearm Explosive Industry Division and Firearm Explosive Legal Division or FELD.

My oversight on operations associated with the National Tracing Center was to maintain consistent processes and memoranda of understanding associated with federal, state, local and foreign law enforcement agencies regarding the tracing of crime guns, suspected crime guns through the distribution chain to the first retail purchaser. Activities included policy revision allowing state and local law enforcement and firearm manufacturers automated e-Trace or electronic trace capabilities access to streamline the firearm trace process for both regulator and user.

The Firearms Ammunition Technology Division is ATF's technology authority relating to firearms and their classification under federal law in response to law enforcement agencies, industry tests, evaluations and classifications, while providing services to the firearm industry. My focus in this capacity was to ensure guidance was consistently provided to all within the parameters of the statute and all presiding ATF ruling effecting commerce and GCA policies. Overseeing operations at the National Firearms Act branch (NFA) required policy development on the importation of restricted post-1986 machineguns and the ATF's enhancement efforts of electronic forms submission of all NFA transfer forms associated with law enforcement and tax paid transfers. This division processes all applications to make, export, transport and register NFA firearms (short barrel rifles, short barrel shotguns, silencers, destructive devices, machineguns etc.). I was responsible for implementation and support deployment between two internal divisions established for managing government entities and industry support branch with NFA weapons

falling under tax paid or tax exemption transfers associated with this national registry.

ATF's firearm and explosive licensing center is charged with timely processing application submission for firearms and explosive licensure associated with Importation, Manufacturing, Dealing with regulated industries. My responsibility was coordinating congressionally mandated requirements on timely issuance of firearm licenses, timely renewals of all explosive licenses with ATFs 25 field division offices. License and permit maintenance in the licensing database required monitoring relative to pending administrative or criminal actions, which impacted ATFs field operations and inspection process. Both licensing centers are at the center of all external communications with field division representatives, and I was positioned to keep this process flowing, servicing our taxpayers.

The Office of Regulatory Affairs and Firearm Explosive Industry Processing division serves to publish, develop and provide guidance on proposed rulemaking and ATF policy that impacts industry and all 25 ATF field divisions. In my capacity as Deputy, I was integrated in this process, review and development of each initiative, Newsletters, Open guidance letters and new proposes rules (NPRM), spearheaded by each division Chief.

### b. Compensation

I have been engaged to provide expert witness services to Petitioner.  For my services, I am being paid an hourly rate of $350.00.

### c. Publications and Previous Testimony

I have not testified as an expert at trial or by deposition in the previous 4 years.  I have not authorized any publications in the previous 10 years.

## II.    Facts and Data Considered

| NO. | DOCUMENT DESCRIPTION | REFERENCE NO. (BATES RANGE/ DEPOSITION EXHIBIT/ECF) |
|---|---|---|
| 1 | Federal Firearms Administrative Actions Policy and Procedures/Zero Tolerance Policy U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives Federal Firearms Administrative Action Policy and Procedures Order ATF O 5370.1E | 01/28/2022 |
| 2 | Multiple Sale Summary - ██████ | US000001 |
| 3 | Administrative Record (redacted), including: | DE 35; 04/11/2024 |

| NO. | DOCUMENT DESCRIPTION | REFERENCE NO. (BATES RANGE/ DEPOSITION EXHIBIT/ECF) |
|---|---|---|
| | | |
| A | Transcript of the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives Teleconference Hearing before Officer William Muller | DE 35; 09/26/2023 |
| B | ATF Exhibit List | DE 35 |
| C | ATF Exhibit 1 Notice of Revocation/Certified Mailing | DE 35; 07/07/2023 |
| D | ATF Exhibit 2 2005, 2006, 2007, ~~2011~~, ~~2012~~, 2013, 2018 License Acknowledgement Form | DE 35; 07/18/2005 08/08/2006 10/03/2007 11/07/2013 09/26/2018 |
| E | ATF Exhibit 3 2023 Report of Violation/Report of Violation with FFL Responses/Acknowledgement | DE 35; 06/15/2023 |
| F | ATF Exhibit 4 Blank ATF Form 4473 with Instructions (2022 version) | DE 35 2022 |
| G | ATF Exhibit 5 ATF Forms 4473 [Violation #1/Appendix 1 re: § 478.102] | DE 35; 07/11/2022 09/16/2022 |
| H | ATF Exhibit 6 ATF Forms 4473 [Violation #2/Appendix 2 re § 478.126a] | DE 35; 12/07/2022 05/19/2023 |
| I | ATF Exhibit 7 2007 and 2011 Warning Letters/Report of Violations | DE 35; 10/24/2007 03/12/2012 |
| J | ATF Exhibit 8 Memo of conversation with Kull | DE 35; 05/25/2023 |
| K | ATF Exhibit 9 Open letter to all Kansas Federal Firearms Licensees | DE 35; 05/09/2011 |

| NO. | DOCUMENT DESCRIPTION | REFERENCE NO. (BATES RANGE/ DEPOSITION EXHIBIT/ECF) |
|---|---|---|
| | | |
| L | Licensee Exhibit 1<br>Out-of-State License Recognition<br>Recognition of Non-Kansas Concealed Carry Handgun Licenses | DE 35;<br>07/01/2021 (effective date) |
| M | Licensee Exhibit 2<br>Permanent Brady Permit Chart<br>Qualifying Permits<br>(one page screen shot) | DE35;<br>08/10/2023 |
| N | Licensee Exhibit 3<br>Permanent Brady Permit Chart<br>Qualifying Permits<br>(enlarged view – page 1) | DE 35;<br>08/10/2023 |
| O | Licensee Exhibit 4<br>Permanent Brady Permit Chart<br>Qualifying Permits<br>(enlarged view – page 2) | DE 35;<br>08/10/2023 |
| P | Licensee Exhibit 5<br>NICS Exceptions<br>(from ATF Form 4473) | DE 35;<br>Revised August 2023 |
| Q | Licensee Exhibit 6<br>To Whom It May Concern Letter from Luke Coldiron, Owner/Software Developer, EZ Arms | DE 35;<br>09/20/2023 |
| R | Final Notice of Denial of Application, Revocation Suspension and/or Fine of Firearms License to Kull Auction & Real Estate Co Inc from Officer William Miller (redacted) | De 35;<br>11/21/2023 |
| S | Letter from Camden Webb, Williams Mullen, to William Miller, Director, Industry Operations, Kansas City Field Division, Bureau of Alcohol, Tobacco, Firearms & Explosives re: In the Matter of the Final Notice of Denial of Application and Revocation of Firearms License 5-48-177-01-6H-01060 issued to Kull Auction & Real Estate Co Inc. | DE 35;<br>11/30/2023 |

| NO. | DOCUMENT DESCRIPTION | REFERENCE NO. (BATES RANGE/ DEPOSITION EXHIBIT/ECF) |
|---|---|---|
| T | Email thread between Camden Webb, Williams Mullen, and William Miller, Director, Industry Operations, Kansas City Field Division re: Kull Auction & Real Estate Co. Inc. – Request for Stay | DE 35; 11/20/2023 12/04/2023 |
| U | Letter from William Miller, Director, Industry Operations, to Kull Auction & Real Estate Co Inc regarding Kull Auction & Real Estate Co Inc, Federal Firearms License Number: 5-48-177-01-6h-01060 | DE 35; 12/04/2023 |
| V | Letter from Camden Webb, Williams Mullen, to William Miller, Director, Industry Operations, Kansas City Field Division, Bureau of Alcohol, Tobacco, Firearms & Explosives re: In the Matter of the Final Notice of Denial of Application and Revocation of Firearms License 5-48-177-01-6H-01060 issued to Kull Auction & Real Estate Co Inc. | DE; 01/05/2024 |
| 4 | ATF Report of Compliance Inspection – Fairburn Pawn | n/a |

## III.     Summary of Conclusions

Based on my experience and review of the documents identified above, as well as my discussions with Kull Auction's ownership, the DIO failed to properly apply existing ATF policy when making its determination to revoke Kull Auction's FFL.  Specifically, the DIO did not consider the lack of public safety concerns with regards Kull Auction's operations and violations of the GCA.  Additionally, the DIO failed to consider the extraordinary circumstances present in this case and failed to apply crucial aspects of the Zero Tolerance Policy when deciding to take administrative action against Kull Auction.  Accordingly, the DIO did not properly apply existing ATF policy in determining whether Kull Auction's violations of the applicable ordinances constituted willfulness and, therefore, authorized revocation of its FFL.

## IV.     Analysis

### a.  Explanation of the ATF's Administrative Action Order 5370.1E, which was enhanced by Executive Order "Zero Tolerance Policy" and Grounds for Revocation.

In the ATF's Administrative Action policy, January 28, 2022 edition, known as the "Zero Tolerance Policy", the ATF identified five violations, when violated even once will result in the immediate revocation of a federal firearms license, absent extraordinary circumstances.

ATFs new Zero Tolerance Policy, which is stated in ATF O 5370.1E, is intended to provide fair and consistent enforcement guidelines for when the ATF takes administrative action against licensees. The policy also establishes a uniform plan of action for administrative action taken to address regulatory violations by licensees. Administrative action against a licensee can include a warning letter, warning conference(s) administered by the Area Supervisor or Director of Industry Operations (DIO), Denial of a license and license revocation.

The Zero Tolerance Policy emphasizes five regulatory violations which greatly affect public safety and are therefore grounds for revocation of a federal firearms license. The policy states that willful violations in these five categories will result in revocation of a federal firearms license. The five regulatory violations identified in the Zero Tolerance Policy are:

(1) Transfer of a firearm to a prohibited person when the licensee knows or has reasonable cause to believe that the transferee is prohibited under federal law from obtaining a firearm;

(2) Failure to conduct a National Instant Criminal Background Check, also known as a "NICS check"; failure to obtain a qualifying alternative permit in lieu of a background check, such as a concealed handgun permit; or failing to wait three business days to transfer a firearm when the NICS system has not yet notified the licensee that it can proceed with the transfer;

(3) Failure to respond to an ATF firearm trace within 24 hours after receipt of the request;

(4) Falsification of records required under the Gun Control Act or making false written statements in the licensee's required records or in applying for a firearms license; and

(5) Refusing the ATF its right of entry to inspect the licensee.

The present case involves only one of these violations. The DIO in this case concluded that the licensee willfully failed to conduct NICS checks, which implicates violation (2) above.

The other violation on which the DIO relied to revoke Kull Auction's license—failure to file an ATF Form 3310.4, or "multiple handgun form"—is not one of the five violations that will result in automatic action to revoke a license. Instead, ATFs Administrative Action Policy / Zero Tolerance Policy states that failure to file a multiple handgun form generally merits only a warning letter, and the policy states that this is the administrative action when the failure is "with a minimum of five instances."

The Zero Tolerance Policy recognizes that unique and complex circumstances may be involved when a licensee is inspected, and violations are found. The policy therefore directs the DIO to consider five factors when deciding on the administrative action that should be taken. These factors are:

(a) Whether the licensee is willing or able to achieve and maintain voluntary compliance.

(b) Whether the continued operation of the licensee would pose a threat to public safety or contribute to violent crime and/or other criminal activities.

(c) Whether the licensee takes responsibility for violations and is willing to work with the ATF to correct them.

(d) Whether the licensee's failure to properly complete and maintain records directly impacts the traceability of firearms.

(e) Whether the violations have a nexus to a person who is prohibited under federal law from obtaining or possessing a firearm.

The Zero Tolerance Policy also states that revocation of a federal firearms license is permitted only when a violation is willful. The policy states that "[t]he term willfulness means a purposeful disregard of, or plain indifference to, or reckless disregard of a known legal obligation."

I am familiar with the Administrative Action Policy and Zero Tolerance Policy enhancement through my oversight duties as Deputy Assistant Director over Industry Operations (Headquarters, Washington, D.C., 2014-2020) and Director of Industry Operations (Denver Field Division 2006-2014). ATF applied the conditions of the Administrative Action Policy for decades. I have personally been involved with two enhancements of the ATF F 5370.1E while serving as Deputy and a working knowledge of the policy for determining findings of willfulness as if effects public safety or negatively impacting ATFs ability to complete firearm crime gun traces. Absent evidence of a licensee's direct nexus to criminal activity, complete failure and/or ability to complete firearm traces as prescribed by regulation 27 CFR 478.25a, or in instances where a licensee has shown a marked improvement in record keeping compliance, ATF has followed a long-standing process of alternate actions with addressing inspection dispositions. In the pursuit of voluntary compliance when there are no public safety violations (straw purchases to criminals or off book transfers to the same) and firearm traceability remains intact, a licensee has conditionally been afforded an opportunity to retain their license, under alternate actions.

**b. The ATF's Use of Repeat Violations to Show Willfulness.**

The ATF regularly relies upon "repeat violations" to establish that a licensee's second or more violation of a regulation was willful. For instance, a compliance inspection conducted in 2020 might disclose a violation of 27 CFR 478.102(a), which requires licensees to run background check through the FBI NICS system of State Point of Contact before transferring firearms to non-licensees (i.e. individuals). If a subsequent inspection conducted in 2023 discloses more violations of 27 CFR 478.102(a), the ATF would consider this a repeat violation even for just one instance or occurrence.

The ATF makes sure to discuss with the license violations that are found during inspections. The lead Industry Operations Investigator (IOI) will typically review each regulatory violation and corrective action with a licensee during a closing conference. This is usually held after the inspection, at a setting where the IOI recaps their findings and reviews the Report of

Violation that captures each violation and corrective action. The IOI will also allow the licensee to ask questions and clarify regulatory requirements.  In this regard, the IOI attempts to ensure that the licensee understands its legal obligations.

The ATF's approach to repeat violations does not, however, consider that a licensee can violate a specific CFR provision in different ways.  The ATF's policy is to consider a second violation of the same CFR provision a "repeat violation" regardless of how the licensee violated the CFR provision.  And when an IOI discusses regulatory violations with a licensee, the ATF's practice is to focus on the specific conduct that led to the regulatory violation so that the licensee understands the violation that was found and avoids it in the future.  The ATF's practice does not include educating the licensee on every instance of conduct that might violate that same CFR provision.

An example of how this might affect the determination of willfulness is a licensee's failure to conduct a background check on two separate occasions. Kull Auction and/or its employees have always conducted background checks when disposition firearms to individual recipients that did not possess a valid permit to carry. In the instances of accepting an out of state permit in lieu of an issued permit in the State of Kansas, where this is an exception to running a NICS background check. During the recent inspection a Kull Auction employee conducted research on the Kansas Attorney Generals law site for guidance and misinterpreted language on reciprocity as it related to conceal carry permits, and gross misinterpretation in relation to the exemption as it related to background checks. But under the ATF's approach to repeat violations, two completely different acts in violating a single CFR are considered the same act in the acceptance of a permit and transfers not going to prohibited persons.

### c.   The ATF's Consideration of Public Safety Concerns and the Absence of Public Safety Concerns Regarding Kull Auction's Operations.

Concerns for public safety, and more specifically keeping guns out of the wrong hands, is the main thrust of the ATF's policy pertaining to federal firearms licensees.  This is apparent in the Administrative Action / Zero Tolerance Policy, which repeatedly emphasizes public safety as the key concern for the policy.

The present case illustrates that public safety should not have been a concern with Kull Auction.  First, Kull Auction is auctioneer, with most of its business being auctions of estate firearms and similar collections.  Kull Auction's customers tend to be collectors and similar buyers. Firearms from an estate or on consignment are regularly checked when acquired to determine whether they are stolen.  Kull Auction makes a special point to inspect these estate and consignment firearms to identify any that are unlawful or noncompliant with applicable laws.  Estate guns are also typically from the first owner and tend to be high value firearms, and firearms in this class are not usually part of secondary market transactions.  Kull Auction is also not open to the general public.  It conducts auctions then schedules individual appointments to complete the firearms transfers.  In this way, Kull Auction knows its customers better than most firearms dealers and can guard against risks such as transfers to a prohibited person and straw purchases.

10

Kull Auction also has procedures in place for running background checks, and it is significant that none of the transferees at issue in the revocation proceeding were prohibited persons. ATF's regular practice during an inspection when an erroneous transaction is identified is to run a NICS check on the transferee. The administrative record lacks any reference to prohibited persons as transferees, so I may infer from this that none were prohibited persons.

Perhaps more significantly, there is no record at all of Kull Auction ever having sold a firearm to a prohibited person. This is a remarkable fact considering that the company operated from 2005 to 2024.

Kull Auction also has an extremely low number of trace requests. A trace request is the process in which the ATF contacts a licensee and asks for information about a firearm because that firearm has been associated with a crime. Having a high number of trace requests indicates that the licensee is an elevated public safety risk because a high number of its firearms sold to customers are associated with crimes. By contrast, trace requests to Kull Auction were very infrequent, and the company's principals and employees recall only about 10 trace requests in the company's entire 19-year history. This is an exceeding low number, indicating that the public safety risk of Kull Auction's operations is also exceedingly low.

> **d. The DIO Failed to Apply Crucial Aspects of the Zero Tolerance Policy When Deciding to Revoke Kull Auction's FFL.**
>
>> **i. The DIO did not consider the enumerated five factors when deciding to revoke Kull Auction for failure to file the multiple handgun form.**

Under the Zero Tolerance Policy, the DIO must consider five factors when it recommends administrative action, including revocation. These five factors are discussed in Section IV.a. above.

It does not appear that the DIO considered these five factors, even though the Zero Tolerance Policy directs him to do so. From my review of the facts, the evidence supporting these factors in Kull Auction's favor is undisputed, and this can be summarized as follows:

(1) Kull Auction demonstrated that it is willing and able to achieve and maintain voluntary compliance, as indicated by its full cooperation with the ATF and its subsequent measures to improve compliance, including full implementation of electronic 4473s;

(2) As discussed above, Kull Auction's continued operation poses no threat to public safety or contribute to violent crime and other criminal activity;

(3) Kull Auction has taken full responsibility for the violations and demonstrated plainly that it is willing to work with the ATF. In this regard, the DIO actually used the fact that Kull Auction took full responsibility for failing to file the multiple handgun form against the licensee. In my experience, licensees sometimes try to make excuses or otherwise avoid responsibility for noncompliance. But in this case, Mr. Kull himself

presented a full, honest explanation of—and took full responsibility for—his decision to send employees home late in the evening with the intent of filing the multiple handgun form the next day.  The administrative record indicates that the DIO did not even consider Mr. Kull's taking of full responsibility, as the Zero Tolerance Policy directs him to do.

(4)  There is no indication that Kull Auction's recordkeeping failures in this case directly impacted the traceability of firearms.  With so few trace requests—about one every other year—Kull Auction's filing the multiple handgun form seven months after the transaction very likely had no impact whatsoever on traceability.

(5)  Finally, there is no nexus whatsoever between the regulatory violations and prohibited persons.

According to the Zero Tolerance Policy, extraordinary circumstances do not need to exist regarding a violation in order for the ATF to use an administrative remedy less severe than revocation.  Considering this aspect of the policy, the lack of consideration of the five factors above, and the Zero Tolerance Policy's statement that the failure to file a multiple handgun form generally merits a warning letter, it is my opinion that the DIO failed to follow the ATF's policy when he decided to revoke Kull Auction's license for failing to file the multiple handgun form.

### ii.  The DIO did not consider extraordinary circumstances when deciding to revoke for Kull Auction's failure to conduct background checks.

As discussed above, the Zero Tolerance Policy states that where extraordinary circumstances are present the DIO may consider administrative action less severe than revocation. In this case, the DIO revoked Kull Auction's license in part because an employee failed to conduct NICS checks on three transferees.  These transferees were to out-of-state residences who presented their concealed handgun permits from their home states.  Had these transferees been Kansas residents, accepting the concealed handgun permits would have been permitted and no NICS checks would have been required. The fact is the transfers were to law abiding citizens and not prohibited persons. The fact that Kull Auctions, attempted to do their due diligence by checking on the eligibility and or qualification on the acceptance of a permit, demonstrates the intent was to comply with the law.

The employee who conducted these transfers appears to have misunderstood the regulation regarding acceptance of concealed handgun permits and NICS checks and has since been terminated.  The employee researched the law in this area, specifically the Kansas Attorney General's website and did not connect it to Brady and NICS exemptions, while erroneously concluded that because Kansas grants reciprocity to the three transferees' home states for concealed carrying purposes, Kull Auction could therefore accept the concealed carry permits for purposes of the NICS background check exception.

The employee was wrong about the law, but there were extraordinary circumstances present that should have been considered.  Most importantly, the ATF recognizes that employee error is an extraordinary circumstance as contemplated by the Zero Tolerance Policy.  As an

example, in a revocation proceeding against Fairburn Pawn, Inc., the ATF decided to conduct a warning conference in lieu of revocation. The basis for this decision included an employee's error in selling a lower AR receiver (which is considered a firearm and has to be disposed of or transferred under the same requirements that apply to a firearm) as an accessory, which is not a regulated item. The employee's error resulted in the transfer of a firearm to a non-licensee without conducting a background check, yet the ATF opted for no revocation because the violation arose from employee error and claim of lack of knowledge.

Other extraordinary circumstances include (1) the fact that two of the transferees in question were existing or prior customers on whom background were previously processed during prior transactions and known to Kull Auction; (2) none of the three transferees are prohibited persons; and (3) there is no indication that Kull Auction had ever been cited for or instructed by the ATF on the issue of accepting out-of-state concealed carry permits in lieu of a NICS check.

Based on the facts I have reviewed and the Administrative Action / Zero Tolerance Policy, it is my opinion that the DIO failed to follow the ATF's policy when he decided to revoke Kull Auction's license for not conducting background checks.

## V.   Conclusion

As set forth above, I am well-versed ATF administrative actions as they pertain to the Administrative Action Policy and Zero Tolerance Policy enhancement. Based on my experience and review of this case, it is clear the DIO failed to follow crucial aspects of ATF's policy with regards to his decision to revoke Kull Auction's federal firearms license. At the outset, the DIO failed to properly appreciate and consider the lack of evidence that Kull Auction's operations and violations were a safety risk to the public when making his determination. Additionally, the DIO failed to apply critical aspects of the Zero Tolerance Policy when deciding to revoke Kull Auction's license. First, the DIO did not consider the enumerated five factors set forth in the Zero Tolerance Policy when he found that Kull Auction acted "willfully" in failing to file the multiple handgun form at issue. Second, the DIO did not consider any extraordinary circumstances as required by the Zero Tolerance Policy when deciding to revoke Kull Auction for failing to conduct background checks, which were in fact conducted but done so under an error of law. Significantly, there has been no evidence presented in this case as it pertains to the violations that purportedly warrant revocation that Kull Auction ever transferred a firearm to a prohibited person. Based on the foregoing, it is my opinion that the DIO failed to properly apply existing ATF policy when making its determination to revoke Kull Auction's FFL.

Submitted By:

Andrew Graham
Chief Executive Officer
Graham Industry Advisors
Phone:  720-670-0096
Email:  andy@grahamia.com

13